746 A.2d 540

IN THE MATTER OF THE ESTATE OF ELEANOR
IRENE HIGGINS LINK, DECEASED.

Superior Court of New Jersey
Chancery Division, Probate Part
Monmouth County

Decided November 3, 1999.

Shulman & Wall (Thomas J. Wall, appearing), attorneys for plaintiff Ann Doolan Carter.

Emmet, Marvin & Martin, LLP (Tyler J. Kandel, appearing), attorneys for Michael J. Catanzaro and Bernard F. Joyce, co-executors of the Estate of Eleanor Irene Higgins Link, deceased, and Michael J. Catanzaro, Bernard F. Joyce and Robert Emmett Link, Jr., as co-trustees of the George Link, Jr. Charitable Trust.

FISHER, P.J.Ch.

Decedent allegedly said she would give her wedding and engagement rings to plaintiff Ann Doolan Carter "when I pass away." Despite the fact that decedent's Last Will and Testament is silent in that regard, plaintiff seeks a turnover of these rings, which decedent's executors resist. Since the rings were never delivered to plaintiff prior to decedent's death, the complaint will be dismissed.

The matter comes before the court upon the return date of plaintiff's initial order to show cause and defendants' cross-motion for summary judgment. While some facts are disputed, defendants' motion for summary judgment assumes, arguendo, the truth of plaintiff's allegations. Accordingly, the court will view the validity of plaintiff's claim based upon the following facts. Simply, according to plaintiff, in either April 1998 or July 1998, or both, the following occurred:

> Mrs. Link and I were alone in her family room having one of our typical conversations. Suddenly Mrs. Link turned quite serious and said "I want you to

make me a promise." I said sure, about what. She went on to say "when I pass away I want you to have my wedding and engagement rings. But I want you to promise me you will always wear them and always wear the wedding band with the engagement ring not one without the other." She was concerned I would wear the engagement ring alone. I told her that while I like the rings, I liked them best on her. She said "please promise me" so I did. I then asked why don't you leave the rings to one of your nieces or nephew so they will stay in the family. She very firmly said "I will leave my rings to who I want and I want you to have them." So I promised again to wear them as she had described.

*Carter Certification,* ¶ 2. Plaintiff has also submitted the certification of Mary Kohler and the affidavits of Michael J. Doolan, Betty Clark and Father Frank Hamill, S.J., to the same effect. Of these other sworn statements, only Mary Kohler places a date on decedent's comments regarding the wedding and engagement rings, namely, the Fall of 1998.

Defendants submitted two affidavits of Michael J. Catanzaro, a co-executor of decedent's estate. In his first affidavit, Mr. Catanzaro stated that decedent "never asked me to give the rings to plaintiff upon her death—or at any time for that matter—nor did I ever agree to give the rings to plaintiff. In addition, I have no knowledge of [decedent] telling anyone else of her alleged desire for plaintiff to have the rings upon her death." *Catanzaro Affidavit* (September 16, 1999), ¶ 5. In his later affidavit, Mr. Catanzaro states:

> ... I recall overhearing a conversation between Mrs. Link, her nurse, Betty Clark and Father Frank Hamill during which Mrs. Link stated that she wanted plaintiff to have her engagement ring upon Mrs. Link's death. While I cannot recall the specific date on which this conversation took place, it occurred some time during the Summer of 1998 ....

*Catanzaro Affidavit* (September 22, 1999), ¶ 3 (footnote omitted).[1]

The Catanzaro affidavits raise an interesting and relevant point, namely, that the conversation he overheard among decedent, Betty Clark and Father Hamill occurred prior to the execution of decedent's Second Codicil to her Last Will and Testament. *Id.,*

---

[1] Plaintiff claims the inconsistency in the Catanzaro affidavits raises questions of fact which bar the entry of summary judgment. Again, this is no bar to summary judgment since the court will accept plaintiff's version as true for purposes of this motion.

¶ 3.[2] It is noteworthy that the Will and its codicils made a number of specific bequests of personal property, referencing various paintings, Persian rugs, vases, and photographs. Indeed, the First Codicil of October 17, 1997 contained a specific bequest to plaintiff of two vases.[3] Despite decedent's specification of various items of personalty in the Will and Codicils, and despite the execution of those documents at or about the time of the alleged conversations between decedent and plaintiff (and decedent and others), decedent made no mention of her wedding and engagement rings in either the Will or the two Codicils. Rather, but for the validity of plaintiff's current allegations, the rings would be disposed of pursuant to the residuary clause of the Will.

Plaintiff contends the words attributed to decedent referred to above are sufficient to form the basis for a gift *causa mortis* or gift *inter vivos*. Plaintiff has studiously avoided declaring which type of gift this allegedly was. Notwithstanding plaintiff's reticence in this regard, her allegations do not, as a matter of law, support a finding of an *inter vivos* transfer. An *inter vivos* gift is, as its name suggests, a gift between the living. Its elements [4] are essentially the same as the elements which form a valid gift *causa mortis* (which will be discussed in greater detail momentarily), except that an *inter vivos* gift, once complete, is not revocable by the donor.[5] A gift *causa mortis* is revocable anytime

---

[2] Decedent's Last Will and Testament was executed on February 6, 1997. Her First Codicil was executed on October 17, 1997 and her Second Codicil was executed on August 27, 1998. *See, Catanzaro Affidavit* (September 16, 1999), Exhibit A.

[3] "I give and bequeath the two vases, one of which is now located in the living room, and the other now located in the dining room of my real property located in Spring Lake, New Jersey, to ANNE DOOLAN, if she survives me."

[4] *See, e.g., Pascale v. Pascale,* 113 *N.J.* 20, 29, 549 *A.2d* 782 (1988).

[5] As explained by one of the leading commentators: "Gifts causa mortis and gifts inter vivos have many elements in common. In each case it is essential that the donor should have performed acts which indicated a manifestation of an

prior to the donor's death. Since plaintiff does not suggest the rings were gifted to her at the very time she spoke to decedent about them,[6] then either a gift *causa mortis* occurred, or nothing at all.

The law of this State does not expansively view the ability of a donor to make such a gift since a gift *causa mortis* is "essentially of a testamentary nature and as a practical matter the doctrine, though well established, is an invasion into the province of the statute of wills." *Foster v. Reiss,* 18 *N.J.* 41, 46, 112 *A.*2d 553 (1955). Thus, it is said that gifts *causa mortis* are not favored. As explained in an earlier case, cited with approval by our Supreme Court in *Foster,* 18 *N.J.* at 47, 112 *A.*2d 553, such gifts are not favored "for the reason that this mode of disposition permits property without limit of value to be transferred by mere delivery, and the proof thereof to be made when death has closed the lips of the claimed donor." *Buecker v. Carr,* 60 *N.J.Eq.* 300, 305, 47 *A.* 34 (Ch.1900).

Such a transfer is a "gift of personal property made by a party in expectation of death, then imminent, and upon the essential condition that the property shall belong fully to the donee in case the donor dies as anticipated, leaving the donee surviving him, and the gift is not in the meantime revoked, but not otherwise." *Weiss v. Fenwick,* 111 *N.J.Eq.* 385, 387–388, 162 *A.*

---

intention to make a gift. In each the donor must deliver the thing which is given. . . There are a number of sharp differences between the two kinds of gifts. A gift causa mortis is made when death is imminent. Such a gift fails if the donor recovers, and he may revoke it if he pleases before he dies. A gift inter vivos is made when the death of the donor is not imminent, and, in the absence of express provisions in the gift, it is not revocable, nor does it fail because of the continued life and health of the donor." Page, *The Law of Wills* (Bowe–Parker 1960), Vol. 1, § 7.5 at pages 289–291.

[6] In plaintiff's certification she claims decedent wanted plaintiff to have the rings "when I pass away." *Carter Certification,* ¶ 2. In her verified complaint, plaintiff states that "Mrs. Link told plaintiff that she wanted plaintiff to have two rings ... *after Mrs. Link's death.*" *Verified Complaint,* ¶ 6 (emphasis added).

609 (E. & A.1932). Accordingly, to be valid, the gift (1) must be made in view of the donor's impending death, (2) the donor must die of the disorder or peril then contemplated, (3) the donor must be competent, (4) the donor must have the intent to make the gift, (5) the donee must accept the gift, and (6) the delivery of the property "must be such as is actual, unequivocal, and complete during the lifetime of the donor, wholly divesting him of the possession, dominion, and control thereof." *Id.,* at 388, 162 *A.* 609. *Accord, Foster, supra,* 18 *N.J.* at 45–46, 112 *A.2d* 553. In this case, there is no dispute that decedent was competent to make the gift and also, for purposes of this motion, it is agreed decedent possessed the requisite donative intent. It also appears from her sworn statements that plaintiff accepted the gift.[7] The parties, in their moving and opposing papers, have not focused on the question of whether the alleged gift was made in contemplation of impending death. There is a good deal to wonder about whether this factor is present. Plaintiff says her conversations with decedent about the rings occurred in April and July 1998, *see, Carter Certification,* ¶ 2, whereas the decedent died on January 24, 1999. There is nothing in the papers to suggest she was dying or even ill when she had these alleged conversations with plaintiff, or that decedent was then contemplating her imminent demise, and the fact that decedent did not die for another six months after the last such conversation would appear to militate against the "impending death" requirement of the doctrine.[8]

---

[7] It can only be inferred from plaintiff's certification that she accepted the gift. *See, e.g., Carter Certification,* ¶ 2 ("I then asked why don't you leave the rings to one of your nieces or nephew so they will stay in the family. She very firmly said 'I will leave my rings to who I want and I want you to have them.' *So I promised again to wear them as she had described.* We changed the conversation back to general things.") (emphasis added).

[8] "In a number of respects the views of the court as to when death is to be regarded as imminent coincide with the general feelings of human beings; but in some cases in which it might have been possible to avoid this issue, the views of the courts have differed from those of most persons. Death may appear imminent because of sickness, or because of the age of the donor, together with

██ The parties have focused on whether decedent made an "actual, unequivocal and complete" delivery of the property during her lifetime which "wholly divest[ed]" her of "possession, dominion and control." *Weiss, supra,* 111 *N.J.Eq.* at 388, 162 *A.* 609; *Foster, supra,* 18 *N.J.* at 48, 112 *A.*2d 553. The decisional law of this state suggests delivery may be effective if only constructive or symbolic. For example, in *Keepers v. Fidelity Title and Deposit Co.,* 56 *N.J.L.* 302, 28 *A.* 585 (E. & A. 1894), the highest court of this state found the delivery of a key (to a box which contained valuable papers) was a sufficient delivery. *See also,* Page, *supra,* Vol. 1, § 7.12 at pages 304–305. And, in *Scherer v. Hyland,* 75 *N.J.* 127, 380 *A.*2d 698 (1977), our Supreme Court found delivery to have occurred where the decedent left a note and a negotiable instrument in her apartment for her absent husband and then leapt to her death. On the other hand, a divided Supreme Court found an absence of delivery when decedent left a letter for the donee in her hospital room before having an operation from which she never recovered. The note gave instructions as to the location of various hidden assets in the residence she shared with the donee. Speaking for the Court, Chief Justice Vanderbilt observed that "[a]lthough the writing establishes her donative intent at the time it was written, it does not fulfill the requirement of delivery of the property, which is a separate and distinct requirement for a gift *causa mortis.* The cash, passbook, and stock book remained at the decedent's home and she made no effort to obtain them so as to effectuate a delivery to the defendant." *Foster, supra,* 18 *N.J.* at 53, 112 *A.*2d 553.

██ In this case, no delivery at all was made or attempted, either physically, constructively or symbolically. Decedent only expressed her intent to make a gift; she never attempted a delivery in any way. In seeking to avoid the effect of this undisputed fact, plaintiff argues this is a situation which "is incompatible

---

his physical condition. *However, the fact that the donor is quite old is not sufficient to make death imminent if he is in good health."* Page, *supra,* Vol. 1, § 7.33 at pages 336–337 (emphasis added; footnotes omitted).

with the performance of such ceremony," quoting *Foster, supra,* 18 *N.J.* at 50, 112 *A.*2d 553. She claims that decedent

> ... expressed to [plaintiff] precise directions on how to wear the rings demonstrating how much the rings meant to her and the Court may take judicial notice that persons do not usually remove their wedding and engagement rings until death removes them, and such rings are frequently disposed of by oral instruction. *N.J.R.Evid.,* R. 201(b).

These assertions are insufficient to demonstrate delivery for a number of reasons. First, when *Foster* spoke of excusing actual delivery when the situation is "incompatible" with such a ceremony, the example then given was a far cry from what plaintiff now suggests. In *Foster,* Chief Justice Vanderbilt used that phrase to describe a gift of a savings account. Noting there can be no actual delivery of a bank account, it was held the delivery of a passbook or other indicia of title is sufficient. 18 *N.J.* at 50, 112 *A.*2d 553. The things which decedent allegedly intended to give plaintiff were tangible items of personal property of a nature quite available for a simple physical delivery. Indeed, the very items in question, at the time of the alleged conversations, were "at hand." Second, to suggest that the mere giving of instructions of how to wear the rings constitutes constructive or symbolic delivery misses the very point of *Foster.* As mentioned earlier, the Court in *Foster* did not find sufficient delivery where the decedent had left a note for the donee describing the location of certain assets in the home the donee shared with the decedent. Third, judicial notice is simply not available to support a claim that persons gifting wedding and engagement rings, upon contemplation of pending death, do not remove them and that "such rings are frequently disposed of by oral instruction." *Pb* at 3. This is certainly not the type of assertion which can be proven through the court's taking of judicial notice. Judicial notice is reserved for proving such facts or propositions which are "so universally known that they cannot be the subject of dispute," [9] or are "so generally known or

---

[9] For example, the court took judicial notice of the prevailing commercial interest rate in *State Dept. of Environmental Protection v. Fairweather,* 298 *N.J.Super.* 421, 429, 689 *A.*2d 817 (App.Div.1997).

are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute." [10] *N.J.R.E.* 201(b). The proposition urged by plaintiff does not fall within either category. While, perhaps, a court could take judicial notice of a happily married person's emotional attachment and desire to retain possession of an engagement or wedding ring, the court is unwilling to take judicial notice of the contention that such items are "frequently disposed of by oral instruction." The accuracy of that statement is not at all obvious or free from reasonable dispute.

In the final analysis, plaintiff's claim must fail as a matter of law because there is an utter lack of proof—even assuming plaintiff's allegations to be true—of a delivery by decedent which left the donor "stand[ing] absolutely deprived of [her] control over it." *Foster, supra,* 18 *N.J.* at 51, 112 *A.*2d 553. *See also, Bendix v. Hudson County National Bank,* 142 *N.J.Eq.* 487, 490, 59 *A.*2d 253 (E. & A.1948) ("it is also indispensable ... that the donor ... should have absolutely parted with that interest which had been his up to the time of the declaration"); *Weiss, supra,* 111 *N.J.Eq.* at 389–390, 162 *A.* 609 ("essential and necessary elements" for a valid gift *causa mortis* include "absolute possession and control of the property by the donee"). Clearly, decedent intended to retain title to the property by physically maintaining possession and control over her rings.

Indeed, while such a result might to some appear unwarranted in light of the words attributed to the decedent, Chief Justice Vanderbilt's comments in *Foster* need only be recalled:

> We must not forget that since a gift *causa mortis* is made in contemplation of death and is subject to revocation by the donor up to the time of his death, it differs from a legacy only in the requirement of delivery. Delivery is in effect the only safeguard imposed by law upon a transaction which would ordinarily fall within the statute of wills. To eliminate delivery from the requirements for a gift

---

[10] *E.g., Nebel v. Nebel,* 99 *N.J.Super.* 256, 264, 239 *A.*2d 266 (Ch.Div.1968) (the availability of a high quality education at Rutgers), *aff'd* 103 *N.J.Super.* 216, 247 *A.*2d 27 (App.Div.1968).

*causa* mortis *would be to permit any writing to effectuate a testamentary transfer, even though it does not comply with the requirements of the statute of wills.* 18 *N.J.* at 52, 112 *A.*2d 553. In other words, as colorfully put by one English jurist, "[w]here, as in the present case, there is no change of possession operating as an immediate transfer, the doctrine of *donatio mortis causa* is not applicable. If we decided otherwise, we should, in effect, be enabling persons to drive a coach and four through the Wills Act." *In re Hughes,* 59 *L.T. (N.S.)* 586 (1888), quoted with approval in *Foster, supra,* 18 *N.J.* at 52, 112 *A.*2d 553. Under plaintiff's view of testamentary dispositions, wills would become entirely unnecessary; persons need only orally advise of their desired disposition of property. Such a view, if accepted, would utterly negate the Statute of Wills. Decedent may very well have orally expressed an intention to give her rings to plaintiff. But, because she did not absolutely divest herself of that property, she could just as easily have changed her mind at some point prior to her death. By insisting upon proof of delivery, as has been the view of New Jersey law for quite some time, there is assurance of the fulfillment of a decedent's wishes consistent with the policies established by our Legislature in the Statute of Wills.[11] If a loose definition of a gift *causa mortis* were adopted, as suggested by plaintiff, the safeguards against fraud and perjury created by our Legislature would be eviscerated.[12]

Accordingly, for these reasons, defendants' cross-motion for summary judgment will be granted and plaintiff's action will be dismissed.

---

[11] Indeed, it seems strange and incongruous that decedent would carefully delineate the disposition of her assets and property, including various items of personalty, in her Last Will and Testament and subsequent codicils, and yet not, if it was in fact her intention, make mention of her alleged desire to leave her wedding and engagement rings to plaintiff.

[12] It bears repeating that the court has no present reason to disbelieve or question the veracity of the persons who have provided certifications and affidavits in support of plaintiff's action. The court's ruling presupposes the truth and accuracy of those sworn statements.